UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

Elizabeth M. Elmer,

    Plaintiff,

v.

Commissioner of Social Security,

    Defendant.

18-CV-6468
Decision and Order

On June 21, 2018, the plaintiff, Elizabeth M. Elmer, brought this action under the Social Security Act ("the Act"). She seeks review of the determination by the Commissioner of Social Security ("Commissioner") that she was not disabled. Docket Item 1. On February 4, 2019, Elmer moved for judgment on the pleadings, Docket Item 10; on April 5, 2019, the Commissioner responded and cross-moved for judgment on the pleadings, Docket Item 13; and on April 25, 2019, Elmer replied, Docket Item 14.

For the reasons stated below, the Court grants Elmer's motion in part and denies the Commissioner's cross-motion.

## BACKGROUND

### I.    PROCEDURAL HISTORY

On August 7, 2014, Elmer applied for Supplemental Security Income benefits. Docket Item 8 at 144-53. She claimed that she had been disabled since August 7, 2013, due to depression, anxiety, asthma, stress headaches, and allergies. *Id.* at 145.

On November 21, 2014, Elmer received notice that her application was denied because she was not disabled under the Act. *Id.* at 66-77. She requested a hearing

before an administrative law judge ("ALJ"), *id.* at 91, which was held on January 31, 2017, *id.* at 38-64. The ALJ then issued a decision on May 31, 2017, confirming the finding that Elmer was not disabled. *Id.* at 20-31. Elmer appealed the ALJ's decision, but her appeal was denied on April 23, 2018, and the decision then became final. *Id.* at 4-8.

## II.   RELEVANT MEDICAL EVIDENCE

The following summarizes the medical evidence most relevant to Elmer's appeal. Elmer was examined by several different providers, but four—Paul Howe, M.D.; professionals at Evelyn Brandon Center for Mental Health; Harbinder Toor, M.D.; and Adam Brownfield, Ph.D.—are of most significance to the claim of disability here.

### A.   Paul Howe, M.D.

On March 15, 2013, Elmer was evaluated by her primary care physician, Paul Howe, M.D. *Id.* at 236. Dr. Howe diagnosed abnormal weight loss, dysuria, and pathesias (tingling sensation) of the feet; refilled Elmer's prescriptions for the antidepressants Trazodone and Remeron; and recommended that Elmer seek psychiatric care. *Id.* at 237. Elmer followed up with Dr. Howe on May 10, 2013. *Id.* at 240. He confirmed his prior diagnoses and added a fourth diagnosis of an unspecified depressive disorder. *Id.* at 242.

On October 16, 2014, Dr. Howe updated his diagnoses to include bilateral lower extremity paresthesia and syncope. *Id.* at 245. He noted that he also suspected tarsal tunnel syndrome and recommended that Elmer undergo electromyography ("EMG") to further understand her condition. *Id.* at 244.

2

Dr. Howe next saw Elmer on August 4, 2016. *Id.* at 440. Elmer reported "headache, dizziness, neck cracking, armpit pain, forearm pain, hand pain, wrist pain, weight loss, hip pain, menstrual pain, eye itching, sinus pressure, right upper medial thigh pain, foot pain, back pain, and acid reflux." *Id.* Dr. Howe renewed Elmer's Remeron prescription; encouraged her to reconnect with her psychiatric providers; and recommended ibuprofen and physical therapy for back pain, Zantac for allergies and gastroesophageal reflux disease complaints, and an X-ray to determine whether she had a fracture in her left foot. *Id.* at 442.

### B. Evelyn Brandon Center for Mental Health

In October 2013, Elmer established care at the Evelyn Brandon Center for Mental Health. Starting on November 12, 2013, and ending on June 11, 2015, she received biweekly individual counseling from Cheryl Chiappone, L.M.H.C., to address her diagnoses of an unspecified mood disorder, an unspecified anxiety disorder, borderline personality disorder, an unspecified depressive disorder, and cannabis dependence. *See, e.g.*, *id.* at 413, 477. Although Elmer missed a number of appointments, the record shows that she was present for at least 23 sessions over this nineteen-month period. *See id.* at 252-425. Elmer's October 21, 2015 discharge papers note that Elmer reportedly stopped treatment due to a lapse in insurance coverage. *Id.* at 252.

Elmer also was seen by at least three different psychiatrists at Evelyn Brandon. On February 13, 2014, psychiatrist Gerhardt S. Wagner, M.D./Ph.D., noted that Elmer reported worsening anxiety that "ma[de] it difficult to leave [her] house." *Id.* at 220. He prescribed the antidepressant Remeron and the antianxiety medication hydroxyzine. *Id.*

3

On June 5, 2014, psychiatrist Prakesh P. Reddy, M.D., noted paranoid ideation, a depressed mood, and poor concentration and memory. He prescribed the antidepressants Remeron and Effexor. *Id.* at 374. Dr. Reddy again prescribed both medications on September 24, 2014, and October 22, 2014. *Id.* at 324-26.

On April 9, 2015, psychiatrist Stephanie Beneski-Barlow, D.O., evaluated Elmer. Elmer reported that she had stopped treatment because she "couldn't make [herself] come" and that "in the last several months she ha[d]n't been leaving her house and sometimes . . . would keep her children home from school." *Id.* at 286. Dr. Beneski-Barlow noted that Elmer was anxious and depressed, prescribed Remeron, and recommended that Elmer engage in individual and group therapy. *Id.* at 287, 289. Elmer followed up with Dr. Beneski-Barlow on June 3, 2015. Elmer reported that "lately her mood ha[d] been 'pretty good,'" but that she was "unsure if she wanted to engage in group therapy because 'it [would] make [her] anxiety worse.'" *Id.* at 262. Dr. Beneski-Barlow continued her Remeron prescription and also started Elmer on the anticonvulsant/anti-anxiety medication Gabapentin. *Id.*

Elmer reestablished care at Evelyn Brandon in January 2017. Jay Pruiett, L.C.S.W., performed a comprehensive psychosocial evaluation of Elmer on February 9, 2017. *Id.* at 470-73. He diagnosed an unspecified mood disorder and borderline personality disorder. *Id.* at 470. Elmer then followed up with William Benton, M.H.C., for counseling on February 23, 2017, and March 6, 2017. *Id.* at 476-84. Mr. Benton noted that Elmer's thought coherency, concentration, and attention were all within normal limits; that she expressed no delusions or other psychotic content; and that her recent and remote memory were "[i]ntact." *See id.* at 477-78, 481-82.

### C. Harbinder Toor, M.D.

On November 5, 2014, neurologist Harbinder Toor, M.D., performed a consultative internal medicine examination of Elmer. *Id.* at 229-33. Dr. Toor noted that Elmer had a normal gait but had difficulty walking, getting on and off the examination table, and changing for the exam. *Id.* at 231. He found that she had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles but noted that Elmer reported tingling and numbness in her toes and hands. *Id.* at 231-32. He also found that her "finger dexterity [was] not intact in both hands." *Id.* at 232. He concluded that Elmer had "mild-to-moderate limitation doing fine motor activity with the hands"; had "moderate limitation[s] standing, walking, bending, and lifting"; and "should avoid irritants or other factors which can precipitate asthma." *Id.* at 232. Finally, he opined that headaches could "interfere with [Elmer's] routine." *Id.*

### D. Adam Brownfield, Ph.D.

On November 5, 2014, psychologist Adam Brownfield, Ph.D., performed a consultative psychological evaluation of Elmer. *Id.* at 223-27. He found that she had an anxious affect, dysthymic mood, intact attention and concentration, impaired recent and remote memory skills, and good insight and judgment. *Id.* at 225. He diagnosed generalized anxiety disorder, possible agoraphobia, an unspecified obsessive compulsive disorder, major depressive disorder (moderate), and unspecified cannabis use, and he recommended that Elmer continue with psychological and psychiatric treatment. *Id.* at 226. Dr. Brownfield concluded that Elmer had limitations in "following and understand[ing] simple directions and instructions, performing simple tasks independently, making appropriate decisions, and relating adequately with others"; mild

5

limitations in "maintaining a regular schedule, learning new tasks, and performing complex tasks independently"; and marked limitations in "appropriately dealing with stress." *Id.* at 225-26.

### III. THE ALJ'S DECISION

In denying Elmer's application, the ALJ evaluated Elmer's claim under the Social Security Administration's five-step evaluation process for disability determinations. *See* 20 C.F.R. § 404.1520. At the first step, the ALJ determines whether the claimant is currently engaged in substantial gainful employment. § 404.1520(a)(4)(i). If so, the claimant is not disabled. *Id.* If not, the ALJ proceeds to step two. § 404.1520(a)(4).

At step two, the ALJ decides whether the claimant is suffering from any severe impairments. § 404.1520(a)(4)(ii). If there are no severe impairments, the claimant is not disabled. *Id.* If there are any severe impairments, the ALJ proceeds to step three. § 404.1520(a)(4).

At step three, the ALJ determines whether any severe impairment or combination of impairments meets or equals an impairment listed in the regulations. § 404.1520(a)(4)(iii). If the claimant's severe impairment or combination of impairments meets or equals one listed in the regulations, the claimant is disabled. *Id.* But if the ALJ finds that none of the severe impairments meets or equals any in the regulations, the ALJ proceeds to step four. § 404.1520(a)(4).

As part of step four, the ALJ first determines the claimant's residual functional capacity ("RFC"). *See* §§ 404.1520(a)(4)(iv); 404.1520(d)-(e). The RFC is a holistic assessment of the claimant—addressing both severe and nonsevere medical

impairments—that evaluates whether the claimant can perform past relevant work or other work in the national economy. See 20 C.F.R. § 404.1545.

After determining the claimant's RFC, the ALJ completes step four. 20 C.F.R. § 404.1520(e). If the claimant can perform past relevant work, he or she is not disabled and the analysis ends. § 404.1520(f). But if the claimant cannot, the ALJ proceeds to step five. 20 C.F.R. §§ 404.1520(a)(4)(iv); 404.1520(f).

In the fifth and final step, the Commissioner must present evidence showing that the claimant is not disabled because the claimant is physically and mentally capable of adjusting to an alternative job. See Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987); 20 C.F.R. § 404.1520(a)(4)(v), (g). More specifically, the Commissioner bears the burden of proving that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy." Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

Here, the ALJ found, at step one, that Elmer had not engaged in substantial gainful activity since she filed a claim for disability benefits on August 7, 2014. Docket Item 8 at 22. At step two, the ALJ found that Elmer had the following severe impairments: "bilateral carpal tunnel syndrome; bilateral tarsal tunnel syndrome; lower back pain; asthma; tension headaches; [an unspecified] mood disorder . . . ; major depressive disorder; [an unspecified] anxiety disorder . . . ; generalized anxiety disorder; [an] unspecified obsessive compulsive disorder; borderline personality disorder; unspecified cannabis use; and alcohol abuse dependence." Id.

At step three, the ALJ found that Elmer did "not have an impairment or combination of impairments that meets or medically equals the severity of one of the

7

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." *Id.* In reaching this conclusion, the ALJ specifically found that Elmer's impairments did not meet the criteria for listing 1.04 (spinal disorders), listing 1.02 (major joint dysfunction), listing 3.03 (asthma), listing 12.04 (depressive, bipolar, and related disorders), listing 12.06 (anxiety and obsessive-compulsive disorders), or listing 12.08 (personality and impulse-control disorders).

At step four, the ALJ determined that Elmer had the RFC to perform "light work" with the following limitations:

> [She could] occasionally . . . lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about six hours in an eight hour day; sit about six hours in an eight hour day; occasionally push and/or pull 20 pounds; frequently finger bilaterally; . . . understand, remember, and carry out simple instructions and tasks; frequently interact with co-workers and supervisors; [have] occasional contact with the general public; . . . work in a low stress work environment (i.e. no supervisory duties, no independent decision-making required, no strict production quotas, minimal changes in work routine and processes, etc.); and . . . consistently maintain concentration and focus for up to two hours at a time.

*Id.* at 24. In reaching this determination, the ALJ accorded "significant weight" to the opinion of the consultative physician, Dr. Toor, *id.* at 26-27; "significant weight" to the opinion of the consultative psychologist, Dr. Brownfield, *id.* at 27; and "[s]ome weight" to the opinion of Elmer's treating therapist, Ms. Chiappone, *id.* at 28. Because Elmer had no past relevant work, the ALJ proceeded to step five.

At step five, the ALJ found that "considering [Elmer's] age, education, work experience, and [RFC], there [were] jobs that exist[ed] in significant numbers in the national economy that [she] could perform." *Id.* at 30. Specifically, the ALJ credited the testimony of a vocational expert ("VE") that Elmer could work as a warehouse support

worker or as a garnisher. *Id.* The ALJ therefore concluded that Elmer was not disabled. *Id.* at 31.

## STANDARD OF REVIEW

"The scope of review of a disability determination . . . involves two levels of inquiry." *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). The court "must first decide whether [the Commissioner] applied the correct legal principles in making the determination." *Id.* This includes ensuring "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the Social Security Act." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)). Then, the court "decide[s] whether the determination is supported by 'substantial evidence.'" *Johnson*, 817 F.2d at 985 (quoting 42 U.S.C. § 405(g)). "Substantial evidence" means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to correct legal principles." *Johnson*, 817 F.2d at 986.

# DISCUSSION

## I. ALLEGATIONS

Elmer argues that the ALJ erred in determining her RFC because first, he did not incorporate Dr. Toor's fine motor limitations into her physical RFC and second, he did not properly account for her limitations in social interaction and stress tolerance in determining her mental RFC. Docket Item 10-1 at 17-29. The Court disagrees with the first objection but agrees with a material portion of the second and accordingly remands the matter for reconsideration of Elmer's ability to find work in light of her individual stress tolerance.

## II. ANALYSIS

When determining a plaintiff's RFC, the ALJ must evaluate every medical opinion received. 20 C.F.R. § 416.927(c). "Although the ALJ is not required to reconcile every ambiguity and inconsistency of medical testimony, he cannot pick and choose evidence that supports a particular conclusion." Smith v. Bowen, 687 F. Supp. 902, 904 (S.D.N.Y. 1988) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); Fiorello v. Heckler, 725 F.2d 174, 175–76 (2d Cir. 1983); Ceballos v. Bowen, 649 F. Supp 693, 700 (S.D.N.Y. 1986)). An ALJ's "failure to acknowledge relevant evidence or to explain its implicit rejection is plain error." Id. (quoting Ceballos, 649 F. Supp. at 702).

### E. Physical RFC

Elmer challenges the ALJ's physical RFC determination, arguing that the ALJ failed to adequately explain his reasoning for rejecting the opinion of the consultative physician, Dr. Toor, that Elmer had moderate limitations in fine motor activity. *See*

Docket Item 10-1 at 17-25. Although Elmer is correct that an ALJ must explain his reasoning for rejecting medical opinions in the record, she is incorrect that the ALJ here failed to do that.

The ALJ adequately considered all the medical evidence in determining Elmer's physical RFC. As Elmer highlights, in November 2014, Dr. Toor, to whose opinion the ALJ accorded "significant weight," *id.* at 27, opined that Elmer had "moderate limitations" in fine motor activity, *id.* at 232. The ALJ concluded, however, that Elmer could "frequently finger bilaterally," *id.* at 24, and he relied explicitly on the opinion of Elmer's treating physician, Dr. Howe, in making this finding, *id.* at 28. As the ALJ explained, "[Elmer's] own doctor . . . reported fewer limitations than Dr. Toor described. Dr. Howe reported that [Elmer] has had back pain for years, but does not experience any radiating numbness, tingling, or weakness in her legs." *Id.* In fact, none of Dr. Howe's treatment notes reference pain or loss of functioning in Elmer's hands, instead discussing only "bilateral lower extremity paresthesias," for which Dr. Howe "recommended EMG testing" to determine whether Elmer had "tarsal tunnel syndrome." *Id.* at 241, 244; *see generally id.* at 240-50 (no discussion of upper extremity pain between March 15, 2013 and October 16, 2014). The ALJ thus explicitly and adequately jusitifed his decision to reject Dr. Toor's opinion that Elmer had moderate limitations in her fine motor skills.

### F. Mental RFC

Elmer also challenges the ALJ's mental RFC determination. She claims that substantial evidence does not support the ALJ's determination regarding her ability to concentrate and pay attention and that the ALJ failed to properly account for her

response to stress in determining whether she could work. The Court agrees with the latter argument.

### 1. Limits in Concentration and Attention

Elmer argues that the ALJ improperly ignored evidence of impaired concentration and attention in determining her RFC. Docket Item 13-1 at 27-29. Specifically, she claims that substantial evidence does not support the ALJ's conclusion that she could "consistently maintain concentration and focus for up to two hours at a time." *See* Docket Item 8 at 24, 27. In reaching this conclusion, the ALJ explicitly relied on the opinion of the consultative psychologist, Dr. Brown, who opined that Elmer's attention and concentration capacities were "[i]ntact, because she was able to count, do simple calculations, and serials 3s, but had to use her fingers" and that Elmer was only "mildly limited in maintaining a regular schedule, learning new tasks, and performing complex tasks independently. *Id.* at 225. But contrary to Elmer's assertions, Dr. Brown is not the only medical source who reached a similar conclusion. The ALJ's finding as to her ability to focus was therefore supported by substantial evidence in the record.

For example, Elmer's therapist, Ms. Chiappone, reported poor concentration during only two of Elmer's 23 counseling sessions between November 2013 and June 2015, *see id.* at 409, 311; in the remaining 21 sessions she reported "[n]o apparent [cognitive] deficits." *See id.* at 252-425. Similarly, although Dr. Reddy reported poor concentration during his three evaluations of Elmer in June 2014, September 2014, and October 2014, *see id.* at 324, 328, 373, Doctors Wagner and Beneski-Barlow reported no issues in this area during their three collective evaluations in February 2014, April 2015, and June 2015, *see id.* at 220, 263, 288. Finally, Mr. Benton reported during his

12

two therapy sessions with Elmer in February and March 2017 that her concentration and attention were "[w]ithin [d]efined [l]imits." *Id.* at 478, 482. Therefore, substantial evidence—*i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co.*, 305 U.S. at 229)—exists to support the ALJ's finding that Elmer could consistently maintain attention and focus for up to two hours at a time.

### 2. Stress Assessment

Elmer also argues that the ALJ failed to consider the impact of her response to stress in determining whether she could perform jobs that exist in the national economy. *See* Docket Item 10-1 at 24-27. Dr. Brownfield, to whose opinion the ALJ accorded "significant weight," Docket Item 8 at 27, opined that Elmer was "markedly limited in appropriately dealing with stress," *id.* at 226. As such, the ALJ was required to make "specific findings about the nature of [Elmer's] stress, the circumstances that trigger it, and how those factors affect [her] ability to work." *Stadler v. Barnhart*, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006) (citing Social Security Ruling ("SSR") 85-15, 1985 WL 56857, at *6 (Jan. 1, 1985) (explaining that "[b]ecause response to the demands of work is highly individualized, the skill level of a position is not necessarily related to the difficulty an individual will have in meeting the demands of the job . . . [and a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment")). The ALJ did not do that.

What is more, an ALJ's inclusion of a generalized limitation of "low stress work" in a claimant's RFC does not ensure a reviewing court that the required individualized inquiry was undertaken. As the Commissioner's own regulations explain:

> A claimant's condition may make performance of an unskilled job as difficult as an objectively more demanding job. [F]or example, a busboy need only clear dishes from tables. But an individual with a severe mental disorder may find unmanageable the demands of making sure that he removes all the dishes, does not drop them, and gets the table cleared promptly for the waiter or waitress. Similarly, an individual who cannot tolerate being supervised may not be able to work even in the absence of close supervision; the *knowledge* that one's work is being judged and evaluated, even when the supervision is remote or indirect, can be intolerable for some mentally impaired persons.

SSR 85-15, 1985 WL 56857, at *6. In other words, an ALJ must consider how a claimant's stress tolerance could impact her ability to perform the specific job or jobs that *otherwise fit her RFC profile*.

The ALJ in this case failed to undertake an individualized inquiry in concluding that Elmer could perform work as a warehouse support worker or as a garnisher. *See* Docket Item 8 at 30-31 (relying on the VE's testimony that Elmer could perform these jobs even with the limitation of "low stress work" without further explanation of how her individualized stress tolerance might impact her performance).

Moreover, this failure was likely harmful to Elmer's disability determination. *Cf. Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (declining remand where "application of the correct legal principles to the record could lead [only to the same] conclusion"). Elmer testified that her anxiety attacks were triggered when she left her house alone. Docket Item 8 at 45-46. She explained that it "takes [her] about a week of mental preparation to . . . leave [her] house for something" because she has "to convince [her]self that it's okay and nothing scary is going to happen" and because she becomes nauseated whenever she leaves the house. *Id.* at 45; *see also id.* at 52 (Elmer testifying that she "[v]ery rarely" takes the bus because she fears "trap[ping] [her]self in there with a bunch of strangers" and "end[s] up getting sick" and needing to "get off the

14

bus before [her] stop"). She also explained that for that reason she did not go to the grocery store alone. *Id.*

To the extent the ALJ may have wholly rejected Dr. Brownfield's stress-based limitations on the grounds that Elmer "ha[d] not been compliant with treatment recommendations," *id.* at 29, substantial evidence does not support that conclusion. Elmer received semi-regular counseling over a span of at least nineteen months. *See id.* at 252-425 (documenting 23 counseling sessions with Ms. Chiappone and six medication management appointments with Drs. Wagner, Reddy, and Beneski-Barlow between November 2013 and June 2015). Although Elmer did have gaps in treatment, she reported contemporaneously that those gaps were due to transportation and insurance issues, *id.* at 252, and she testified at her hearing that she struggled to leave her house even for therapy, *id.* at 51.

If anything, Elmer's struggle to obtain consistent treatment underscores the importance of considering her individual stress tolerance in determining whether she is disabled. Elmer's anxiety over leaving the house and interacting with others—stressors that could be expected to impact her ability to meet the demands of the VE's proposed work—underlay her intermittent treatment record. The VE explained that a warehouse support worker and a garnisher would need to "frequently interact with coworkers and supervisors" and "have occasional contact with the general public." *Id.* at 57. In fact, the VE testified that if Elmer were "unable to work in a low stress environment" or "could not have any contact with coworkers or supervisors," she could not perform either of those jobs. *Id.* at 58, 62. Accordingly, remand is appropriate so that the ALJ can

properly consider, at step five of the sequential evaluation process, whether Elmer could perform any of the available jobs given her individualized stress tolerance.

## **CONCLUSION**

For the reasons stated above, the Commissioner's motion for judgment on the pleadings, Docket Item 13, is DENIED, and Elmer's motion for judgment on the pleadings, Docket Item 10, is GRANTED in part and DENIED in part. The decision of the Commissioner is VACATED, and the matter is REMANDED for further administrative proceedings consistent with this decision.

SO ORDERED.

Dated: November 14, 2019
         Buffalo, New York

                                        */s/ Lawrence J. Vilardo*
                                        LAWRENCE J. VILARDO
                                        UNITED STATES DISTRICT JUDGE